Calhoun v. United States of America. for the appellant. Good morning. May it please the Court, I'm Wendy Overmeyer with the Federal Public Defender for Appellant Christopher Calhoun. And I'd like three minutes for rebuttal. Calhoun is before this Court seeking, as he has all along, for the sentencing guidelines that were in effect at the time of his sentencing to apply to his case. Christopher Calhoun, he pled right after the Fair Sentencing Act was enacted, and he was sentenced after its guidelines took effect. And since that time, the Supreme Court has decided in Dorsey that both the Fair Sentencing Act and its guidelines apply to defendants such as Calhoun. And that's not really in dispute here before the Court today. What is in dispute is whether Mr. Calhoun's plea agreement prohibits the application of the sentencing guidelines that were in effect at the time of his sentencing, the lower guidelines effective under the Fair Sentencing Act. And this Court looks at that issue de novo to the issue of a plea waiver. And the dispute here is in paragraph four of the plea agreement where the parties talk about Calhoun's waiver of the retroactive application of the Fair Sentencing Act and future guideline changes. And this has been in dispute since sentencing, before sentencing really, when the parties filed their sentencing memoranda. It became clear that Mr. Calhoun had a very different interpretation of those words than the government did. Mr. Calhoun believed that the language in the plea agreement meant that the future change meant the changes coming after his sentencing date, because it is statutorily required that the sentencing guidelines in effect at the time of sentencing control the case. The government had a differing opinion. If your position is correct, would the remedy be to vacate the plea? We're asking to go back for resentencing. But why wouldn't the proper remedy be to vacate the plea? I think the plea itself, when there's an ambiguous term, I don't know that that vacates the entire plea agreement itself. I think that term is read in the defendant's favor. And here that would mean that it just goes back for resentencing under the guidelines in effect at the time of his sentencing. What you're arguing is clearly not what the district judge interpreted what was going on. Is that right? That's right. That's correct. Pretty express. He says this is just not what was on the table. He was. There was a very heated debate. There's no deference to what's going on to the district judge who's there and knows what's going on, presumably? This is reviewed de novo by this court that can look at the entire record, obviously, in the case. What we're reviewing de novo is what was intended by these documents, right? And what he had the people who put these documents together in front of him and figured out this is what they meant. The parties had very differing interpretations that became apparent immediately. And they didn't really make much difference until the subsequent events occurred. At the time he was sentenced, Carradine was still controlling law in the circuit. And it was not until Dorsey came out that that was overruled. And it was clear that the guidelines would apply to Mr. Calhoun. But he asked before sentencing and after sentencing that they apply to his case and didn't believe that that violated his plea agreement. Because the date, the future guideline change, the date of that kind of the triggering date for the future change was not clear. How much of a hearing was there before the district court at the sentencing? At sentencing? Or did the district court just accept the plea agreement? The district court, in the very beginning of the sentencing hearing, it didn't take very long. I think it's only three or four pages of the transcript, talked about the plea agreement and how it had sided with the government's interpretation. And earlier in the case, the court had stated that if the Sixth Circuit or the Supreme Court decided that the new law applied to Calhoun, that was up to them. But he was obviously bound by this court's law at that time and was locked in by Carradine. And Calhoun argued that the FSA was clear about that the guidelines should take effect. But, of course, that wasn't made completely clear until the Supreme Court made its decision in Dorsey. And that's what grants this power or this court power to correct his sentence. And here, I think the ambiguity comes not only from the disagreements, but from the plea agreement itself. There are conflicting provisions in paragraph seven and even eight. In paragraph seven, it states that the guidelines in effect at the time of sentencing will control. And paragraph eight also says the range will be determined at the time of sentencing. And when you read all of that together, the portions conflict. And that's what Calhoun has said all along, that that did not lock him in to the guidelines in effect of his plea. He could still get the guidelines in effect of his sentencing. And I think what's very significant. There was no ineffective assistance of counsel. Well, that's obviously looking back. Hindsight is 20-20. And we would give Calhoun very different advice today. He would be in wildly different circumstances. Under the Fair Sentencing Act, he would face a five-year mandatory minimum instead of ten. That could have gone up only to a ten-year minimum with one 851. He never would have been subject to a mandatory life sentence, which is what he was subject to in this case before signing the plea agreement. And that was a very realistic probability. They had filed one 851 the very morning of the plea. And they had another one ready to go if he didn't sign the plea, if he pled open or if he went to trial. So he avoided that. So he avoided a life sentence by signing. He avoided what appeared at that time to be the possibility of a life sentence. The possibility at that time. But that's the nature of bargaining, isn't it? I mean, you take into account that things may change and you bargain. There's also a chance at that point in time that he might go to jail for life if he acted differently, right? There's a very good chance. So he precluded that. There's a very good chance. And I think what's significant... Why couldn't he be held to his agreement, I guess? That's what I think the district judge below is like looking at this and saying, all this stuff was on the table. We didn't know exactly what was going to happen. And so you decided to avoid certain kinds of high-end risks by giving up certain kinds of low-end possibilities that might occur. All right? So it might look really bad if you play it this way, and it might look really great if you play it the other way. So just settle for the difference. But now you're trying to renege on the settlement. That certainly seems to be what the district court saw. That is what the district court saw. And isn't that practically, as a practical matter, what was there? At sentencing, Calhoun again made clear that he did not believe that's what the plea agreement had said. With the future guideline change, with a retroactive application of future guideline changes, that meant something that was going to happen after his sentencing, not before. And the FSA's guidelines here, they still allow the parties to seek what the plea agreement intended. His range under the FSA's guidelines, his range is 110 to 137. So it still allows the government to seek their sentence of 120 months. But didn't he agree not to argue about the retroactivity of the guidelines? Well, this isn't a retroactive application of guidelines. That wasn't my question. He did agree to that, right? He did agree to that. An example of a... So if he agreed to not, I mean, isn't Carradine, wasn't Carradine discussed in general terms as whether the guidelines are retroactive or not? Carradine talked... It looks like he's giving up on an argument to argue that Carradine is wrong, even if somebody else did or actually did say Carradine was wrong. That's what I'm saying. If you look at it just in terms of bargaining, I can see where the district judge is coming from here. The district judge says, you gave this, you know, that was possible, and you gave it up. And it sure looks like that's what he gave up when he says, I'm not going to argue about the retroactivity of the guidelines, right? He did give up his right to future guideline changes. It's simply a... It's stated in terms of retroactivity, right? Of retroactivity, and Calhoun made the argument all along. Retroactivity of the FSA. Retroactivity of the FSA and its guidelines. And neither one is retroactive application here. I mean, they were both in effect at the time he pled. It was a controlling law at the time he pled and was sentenced. Of course, under prior precedent, it didn't control. But the Supreme Court has since changed that. I can follow the argument. It was kind of an esoteric argument. It's like, I'm not going to make an argument, but if somebody else makes it and it is successful and it's retroactively applied to right now, then I'm not making a retroactive argument. I mean, that's basically what you're saying, right? It's not retroactive because later on, it was determined that that was the law now, so I'm not making a retroactive argument. Is that the nature of your argument? That was the nature of his argument at sentencing. And I can say it sure seems logical for the district judge to say, you know, that's not what you bargained for. The district judge is just wrong, according to you, in terms of what was agreed to there. I think the plea agreement is ambiguous. And when a plea agreement is ambiguous, it's construed against the government. It's up to them to choose wording that could have made that very clear. And, again, this is not a case where he did receive a life sentence and he's now going to go down to five years. He received a 12-and-a-half-year sentence, and his range under the FSA is 110 to 137. So, again, the government can see... He didn't know that at the time he made the deal, right? What's that? He didn't know that at the time he made the deal. At the time he made the deal, it was not... Everyone thought that there was a possibility of a whole lot more, right? It was not clear what the amendment would be at the time he signed the plea agreement. The sentencing commission had not released that information yet. And I think an example of a future guideline change is the one that's coming up this year, is where the drug table is going to be lowered by two levels. And that is something that Calhoun clearly has given that as a future guideline change to crack cocaine sentencing that he would not be subject to. And he's still locked into seeking a sentence within the range. He can't seek a sentence below 110 here. So it's not that he can seek down at the mandatory minimum of five years. The government can still seek double the mandatory minimum of 120. If instead of saying, I won't make any arguments regarding the retroactivity of the FSA, he had said, I won't make any arguments based on the non-applicability of carotene, then you would lose? If he had said that carotene... He said, I accept carotene for purposes of my sentencing. That the FSA and its guidelines would apply? Whatever carotene says, yeah. If he had said that, then... Is that right? I think it still leaves a question of the guidelines. It's a future guideline change date that we're looking at here. And he assumed it was sentencing when the government assumed it was the time of his plea. And when that happens, it's a constitutional issue here to be narrowly construed against the government. It's the government's burden to precisely choose the language and not the defendant. And so I think here the language was imprecise and it created this ambiguity that was immediately inherent upon sentencing. I see I'm out of time. Did you really answer my question or not? If he had... If the language about... If he agreed not to... Instead of saying, I won't challenge the retroactivity of the FSA, he had said, I accept carotene as the law for purposes of this sentencing. And I agree to that because I'm getting some other foregoing of possible greater sentencing at that time. Then it would be clear, right? I think it would be clearer. I think that's very different than what the plea agreement said. That was my next question, which is how is it... I mean, in practical terms, that's what saying I won't challenge the retroactivity of the guidelines means at that time. Don't you still have your argument about paragraph 7 and 8? Yes. I mean, in the hypo, if paragraph 7 and 8 still exist, 7 says consider the advisory guidelines in effect at the time of sentencing. Paragraph 8, guideline sentencing range will be determined at the time of sentencing. Right. Yes, there are conflicting paragraphs here. But if you do that in light of carotene, then... Okay. I think the government could have taken those paragraphs out, and that would have also made it less clear. But that's not what happened in this case. Okay. When was carotene decided compared to the various events here? Let me see. Carotene came out... I don't have the precise date. It was 2010. So that is the period when all of this... It was the same period that this was all taking place. I forget offhand, and I apologize if it... That's okay. It was obviously easy to... It was in 2010. That was really silly, I guess, because carotene happened after that, I suppose. I don't know. Yeah. Okay. Thank you very much. Good morning. My name is Kelly Galvin. I represent the United States of America. May it please the Court. Your Honors, to answer your first question, carotene was decided on September 20th of 2010, which was, in fact, prior to the time of sentencing in this case. Mr. Calhoun has been trying to renegotiate his plea agreement basically ever since he signed it. Probably no other defendant in the district court has had the opportunities that Mr. Calhoun had by way of an advisement from the court of what it intended to do. It is highly unusual for a defendant to know well in advance of the time that he pleads guilty and is sentenced that the court is going to apply a very specific law. Now, the defendant makes much of the term retroactive. It is, in fact, the defendant who first brought up the term retroactive. The defendant first used that term in his motion before the court pretrial to determine whether or not the FSA would, in fact, apply. The FSA was passed on August 3rd of 2010. The defendant filed his motion on August 4th of 2010. The court gave the parties the opportunity to brief that issue and, in fact, held a hearing, and the court ultimately determined that the FSA would not, in fact, apply to Mr. Calhoun's situation. He subsequently pleaded guilty on August 18th of 2010. Given Dorsey saying that the FSA should apply to people such as this defendant, why shouldn't we, with the benefit of Dorsey now, on this 2255, apply the FSA? And, Your Honor, I would agree that in almost all cases it, in fact, would apply. What makes this case so very different is the fact that the parties specifically negotiated that issue up front. We were well aware at the time that the FSA was likely to be enacted at almost any time, and the parties took great pains to try and make a determination of what the appropriate sentence perhaps could end up being. And as you can see from what we bargained for, we were looking for that specific sentence which was within that guideline range, which was a significant reduction from the potential of life imprisonment. There are ambiguities or conflicts, though, between the language in 4 and then 7 and 8. So in 4, if you wanted to be clear, you could say for any application of the Fair Sentencing Act as opposed to retroactive, because what does retroactive mean? Or future guideline changes, any guideline changes. Your Honor, I believe the reason for the term retroactive was because obviously at that time it had not yet been decided whether or not the FSA would apply to his case. So the only way it could have applied was obviously by being retroactive. Secondly, as I stated, the defendant first used the term retroactive in his pretrial motion. So the government obviously was cognizant of the fact that that's how the defendant thought the FSA could apply to his case, was retroactively. Again, Your Honor, paragraph 7 does not state that the court shall use the United States Sentencing Guidelines in effect at the time of sentencing. It says the court will consider it, and if you look at the sentencing transcript, the district court definitely said it would consider. However, it was going to construe the plea agreement in this case, which was obviously very much hard bargained for. The defendant's waiver is not ambiguous, and in fact... How about the intent of Congress? I'm sorry, Your Honor? The intent of Congress. Doesn't this conflict with the intent of Congress and the Fair Sentencing Act? Your Honor, again, I would agree with you that in general terms it could. However, in this specific instance, I don't know that this court has seen any other case like this one where the party specifically bargained for this in advance. But are they bargaining away the intent of Congress? No, Your Honor, I don't believe they are bargaining away the intent of Congress. We bargained for something very specific, which was that the defendant would not receive a life sentence of imprisonment. Your Honor, the defendant is the one who has sort of construed this ambiguity, if you would. At the time the defendant entered his plea, he had already been told that the FSA would not be applied to his case. The very thorough plea colloquy by the district court judge did not indicate that the defendant was ambiguous about any of the terms. In fact, his plea agreement, which was August 18th of 2010, after the FSA had already been enacted, he specifically agreed not only to the guideline range, he agreed that the statutory penalties were in fact the pre-FSA penalties. He agreed to the mandatory minimum of 10 years that was applicable in this case. He agreed to all the terms of the supervised release violation and the potential fines and other penalties. He then agreed to waive the FSA application, either retroactively or with any future guideline changes. He agreed to the base offense level in this particular instance. He agreed to an appellate waiver of the 2255. Every time the district court asked him questions, he never indicated that there was any ambiguity. He never indicated that he did not understand any of the terms of his plea agreement. And he was given that opportunity. Then again, at the time... To be fully accurate, he didn't know the state of the law as it was then, even though nobody knew it, or stated differently. He didn't know that the guidelines did apply to him, even though... I mean, the revision of the FSA guidelines did apply to him, even though they all thought that they didn't at that time. So there was some lack of knowledge, is what I'm saying. Lack of knowledge as to the law that we have later determined was applicable at that time. However, Your Honor, on September 20th, I believe, when Carradine was decided, he was sentenced then in November. So in November, we knew at the time that he was going to be sentenced that Carradine said the FSA would not apply. He didn't know about Dorsey. Correct, Your Honor. Certainly no one could have anticipated what Dorsey... Can you distinguish this Hogg case? Yes, Your Honor. Hogg was in fact a direct appeal from the denial of the defendant's motion to withdraw his plea. Certainly in this particular case, Mr. Calhoun was given that opportunity at the time of sentencing. When the defendant persisted that he felt that these terms were in fact ambiguous, it was actually the government who first suggested that the defendant's plea be withdrawn and the case set for trial. And the defendant specifically decided that he did not want the court to do that. The district court... I understand the context is different, but isn't there language that suggests that Hogg didn't knowingly voluntarily agree to something because he didn't know about Dorsey when Dorsey hadn't been decided yet? However, Your Honor... Is that right? Yes, Your Honor. I mean, it's not directly on point, but it kind of conveys support for your opponent's position. And I do understand that, Your Honor. However, the defendant was given the opportunity to withdraw his plea, and in Hogg, he was denied that opportunity. So Mr. Calhoun was given yet another chance. I understand that's a distinction, but there still is this idea that we've accepted, at least in one published opinion, that how knowing something is. And you said he knew all this, he knew, he knew, he knew, but he didn't know about Dorsey. However, in the Hogg case, he did not specifically agree to waive the application of the FSA or any future guideline changes. So that, in essence, is a very big distinction of both of these cases. But he agreed to waive the retroactive application of the FSA. So does Dorsey call the application of the FSA retroactive to cases such as this? I'm sorry, Your Honor. The plea agreement says to waive the retroactive application of the FSA, and I'm wondering whether Dorsey calls the application of the FSA to cases such as this retroactive. Again, Your Honor, I think the very big distinction in this case is the fact that he did specifically agree to waive. There are no other cases. You haven't answered my question. Does Dorsey say that it is a retroactive application of the FSA that Dorsey is requiring, or is Dorsey saying this is what the FSA should apply to? I believe it's the latter, that the FSA, that this is what it should apply to. So it is not a retroactive application. It's a construction of the FSA and the applicability of the FSA that happens in Dorsey. Correct, Your Honor. A lot of people called it partial retroactivity. Given that Congress did not specifically state in the statute, obviously that is what has caused a lot of this to begin with. We're just trying to figure out what the words in the plea agreement mean. It wouldn't be a shocking interpretation of Dorsey to have a headline saying partial retroactivity. Correct, Your Honor. Your Honor, in addition to this, the defendant did have also an appellate waiver provision which was contained within his plea agreement. Specifically that stated, any sentence to the extent it exceeds the maximum of the sentencing range determined under the advisory sentencing guidelines in accordance with the sentencing stipulations and computations in this agreement and the criminal history category found applicable by the court. So the defendant by very definition in terms of his 2255 is disagreeing with the sentencing stipulations and computations in this agreement which is something which is specifically prohibited in fact by the plea agreement to begin with. Perhaps one of the most compelling quotes from this case was from the district court which was at the time of the court's order on the 2255 and the court explained multiple times over the essence of the agreement. The defendant would give up its right to file a section 851 enhancement, a significant concession considering Calhoun would have otherwise faced a mandatory life sentence in return for Calhoun giving up his right to request the application of any future guideline changes. The practical effect which the court went over with Calhoun at both the change of plea and sentencing hearings was that the base offense level for the 92.7 grams of cocaine base would be 30. Calhoun understood the terms of the agreement and made his choice knowing full well the consequences of accepting or rejecting it. His current motion which aims to sweeten an already generous deal in a way that neither Calhoun, the government, nor this court envisioned is therefore denied and that is at page ID 507. Now you note properly that paragraph 4 calls for not filing any motion regarding future guideline changes. Now my recollection is that the guidelines were amended November 1st and then he's sentenced November 10th. That is correct. So how is that a future guideline change? Because again, Your Honor, at that time Carradine had not yet been decided. It had not yet been determined that that would apply to an instance such as Mr. Calhoun's where the conduct occurred pre-FSA but the sentencing was post-FSA. So they were using the word future to refer to things that might happen before sentencing but they would be called future even though they were before sentencing. The time of the plea is when it should be construed. So anything which would happen after the time of the plea and at the time of the plea those guidelines were not in effect yet because the plea was on August 18th. Again, Your Honors, what is most important in this case is the fact that the defendant waived a potential right just as a defendant may waive any of his constitutional rights or other rights. So this is a bargained for thing in a plea agreement. The defendant gave up the chance to have a life sentence of imprisonment and the government gave up filing those 851 enhancements. This was a significant concession by the government and it was one that the defendant did nothing really to warrant. This case had been pending for an extremely long period of time and the government and the defendant both anticipated that the FSA perhaps might apply. That was in fact one of the reasons this case was continued for the time period that it was because the parties were hoping and waiting to see if the FSA would in fact be enacted. So Mr. Calhoun received great benefits by the numerous continuances which even allowed him to be in this position because he consistently and persistently asked the court to continue his case until the FSA had been enacted. Under the Majort case, obviously a defendant can in fact waive a substantial right as in that case the defendant agreed to be sentenced under pre-Booker conditions. Likewise the Wilson case which is that the defendant can waive any particular right, even those constitutional rights. The district court also said in this particular case that it certainly seemed that the defendant was arguing both for and against the plea agreement depending on which provisions he liked and which provisions he did not like. And the district court emphatically informed him that he couldn't argue for the agreement and against the agreement at the same time. That is what Calhoun has been doing since the time of his plea and we would ask the court to deny his 2255 appeal. What's the particular language in the plea agreement that uses the word future? Remind me. That is paragraph 4, your honor. It is page ID number 284 which it is that the defendant waives the retroactive application of the Fair Sentencing Act of 2010 or any future guideline changes for cocaine-based sentences. Okay, so it's future guideline changes, it's not future developments in the law. It's future guideline changes, right? Correct, your honor, because at the time the FSA had been enacted but the guideline amendments had not been made yet. That answers my question, thank you. Thank you, your honors, very much. Thank you. I'll first address the issue of the appellate waiver in the plea agreement. The government did not invoke the appellate waiver in its first response back to Mr. Calhoun's 2255 and so their reliance on the appellate waiver has been forfeited in this case. And the government stood up here and said that Mr. Calhoun didn't deserve the deal that he got at the time because the case had taken so long. Well, Mr. Calhoun didn't deserve a life sentence in a non-violent street-level offense that involved only 92 grams of crack and the Supreme Court agrees with that in enacting the FSA to apply to those who were pled and sentenced after its date. That's not a revolutionary statement of the law. It's something that the law in control at the time of plea and sentencing controls this case and that is what Calhoun has sought all along. And bad law and the poorly worded plea agreement shouldn't interfere with due process need for fairness and crack cocaine sentencing. And so Calhoun today asks this court to follow the clear directives of Congress, the President, the Supreme Court, and the Department of Justice itself who has changed this policy since 2010 or I'm sorry, 2011, a year before Dorsey. The Department of Justice decided that the Fair Sentencing Act would apply to people in Calhoun's position and now also that 851s should not be filed in cases such as Calhoun's where there was no gang activity, there was no large-scale trafficking, there was no violence here in this state. And so I would remand him for resentencing under the FSA guidelines and thresholds in effect at the time of his sentencing. Thank you. Thank you both for your argument. The case will be submitted. Would the clerk call the next case please?